UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                     Plaintiff,

          v.

HOWARD E. BROOKS,

                  Defendant.
_____

<u>DECISION & ORDER</u> and
<u>REPORT & RECOMMENDATION</u>

16-CR-6028L

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. David G. Larimer, United States District Judge, dated March 24, 2016, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 22).

On March 24, 2016, the grand jury returned a six-count indictment charging defendant Howard E. Brooks ("Brooks") with one count of receipt of child pornography, one count of attempted distribution of child pornography, and four counts of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(a)(5)(B).  (Docket # 21).  Currently pending before this Court are motions by Brooks to suppress tangible evidence and statements.[1]  (Docket ## 31, 40).  For the reasons discussed below, I recommend that the district court deny Brooks's motion to suppress statements on the grounds that his *Miranda* rights were violated or that his statements were not voluntary, and this Court will conduct a further

_____

[1]  Brooks filed omnibus motions seeking other forms of relief including, *inter alia*, discovery and inspection, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 31).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on July 28, 2016.  (Docket ## 35, 36).

evidentiary hearing concerning Brooks's motion to suppress the fruits of the execution of the warrant.

## FACTUAL BACKGROUND

### I.   Network Investigative Technique ("NIT") Warrant

On February 20, 2015, the Hon. Theresa Carroll Buchanan, United States Magistrate Judge for the Eastern District of Virginia, issued a warrant to search property located in the Eastern District of Virginia, which was described in an attachment to the warrant.  (Docket # 31 at 31-33).  The attachment indicated that the warrant authorized the use of the NIT, a computer code, to be deployed on a computer server operating on the "[Playpen]"[2] website – a child pornography website that was operating on the Tor network (explained in more detail *infra*) and was located at a government facility in the Eastern District of Virginia.  (*Id.*).  The warrant also authorized the NIT to obtain information from "activating computers," referring to computers of any user or administrator who logged into Playpen by entering a username and password.  (*Id.*).  The warrant identified the information to be seized as the following:

1. the 'activating' computer's actual IP address, and the date and time that the NIT determine[d] what that IP address is;

2. a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other 'activating' computers, that [would] be sent with and collected by the NIT;

3. the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

4. information about whether the NIT had already been delivered to the 'activating' computer;

---

[2]   The warrant and its supporting materials refer to the website as the "TARGET WEBSITE," although the parties' submissions make clear that the website is called "Playpen."  (Docket # 34 at 1).

5.  the 'activating' computer's Host Name;

6.  the 'activating' computer's active operating system
    username; and

7.  the 'activating' computer's media access control ('MAC')
    address[.]

(*Id.*).

Federal Bureau of Investigation ("FBI") Special Agent Douglas Macfarlane ("Macfarlane") submitted an affidavit in support of the warrant application. (*Id*. at 34-66). Macfarlane's affidavit stated that he had been employed by the FBI since 1996 and had participated in investigations involving child pornography and the sexual exploitation of children. (*Id.* at ¶ 1). According to Macfarlane, the targets of the NIT investigation included the administrators and users of the Playpen website. (*Id.* at ¶ 6). Macfarlane stated that the Playpen website was dedicated to the advertisement and distribution of child pornography, discussions of child sexual abuse, including methods and tactics offenders could use to abuse children and avoid law enforcement detection. (*Id.*). Macfarlane stated that the administrators and users of the Playpen website regularly sent and received illegal child pornography using the website. (*Id.*).

Macfarlane's affidavit explained that the Playpen website operated on the Tor network, which provided anonymity to its users. (*Id.* at ¶ 7). According to Macfarlane, the Tor network was designed by a United States Naval Research Laboratory to protect government communications and is now available to the public. (*Id.*). In order to access the Tor network, a user has to install Tor software. (*Id.*). According to Macfarlane, Tor software protects users' online privacy by routing their communications around a distributed network of relay computers, effectively masking the users' Internet Protocol ("IP") addresses. (*Id.* at ¶ 8). Macfarlane

explained that when a user connects through the Tor network, the user's IP address listed in the monitored website's IP address log is the IP address associated with the last computer through which a user's communications were routed instead of the user's actual IP address, a feature that impedes any ability to trace the Tor user's actual IP address. (*Id.*).

The FBI first learned of the Playpen website in December 2014, after receiving information from a foreign law enforcement agency that a known IP address appeared to be associated with the Playpen website. (*Id.* at ¶ 28). The FBI investigated the IP address and verified that the Playpen website was hosted from that address. (*Id.*). Through the execution of a search warrant in January 2015, a copy of the server that was assigned to the IP address was seized by the FBI. (*Id.*).

FBI agents reviewed the contents of the server and discovered that it contained a copy of the Playpen website. (*Id.*). The FBI maintained a copy of the server containing the Playpen website on a computer facility located at a government facility in Newington, Virginia, located in the Eastern District of Virginia. (*Id.*).

According to Macfarlane, although data from the server provided evidence of criminal activity that had occurred on both the server and the Playpen website, FBI agents were unable to learn the identities of the users and administrators of the Playpen website. (*Id.* at ¶ 29). Macfarlane explained that although some non Tor-based websites have IP address logs that facilitate the location and identification of its users, the Playpen website, by contrast, contained only the IP address associated with the last Tor "exit node" for each user. (*Id.*). Thus, review of the website's logs would not assist law enforcement agents in identifying its users' actual IP addresses, without which their identities and locations could not be determined. (*Id.*).

On February 19, 2015, the FBI executed a search at the residence of the suspected administrator of the Playpen website and thereafter assumed administrative control of the Playpen website.  (*Id.* at ¶ 30).  According to Macfarlane, the FBI planned to continue to operate the website from the government-controlled server located in the Eastern District of Virginia for a limited period of time in an attempt to identify the administrators and users of the site.  (*Id.*).  To further that plan, the FBI sought, through Macfarlane's warrant application, judicial authorization to deploy the NIT to investigate users or administrators who logged onto the Playpen website by entering a username and password.  (*Id.* at ¶¶ 31-32).  Specifically, operation of the NIT would cause the user's computer to transmit to a government-controlled computer data that would assist the government in learning the users' identities.  (*Id.* at ¶ 33).

## II.    <u>July 14, 2015, Interview of Brooks</u>

This Court conducted an evidentiary hearing concerning the circumstances surrounding statements made by Brooks.  (Docket ## 37-38).[3]  During the hearing, the government offered testimony from FBI Special Agent Christopher Mayfield ("Mayfield").  (Tr. 4).  Mayfield testified that he had been employed by the FBI for approximately eighteen years.  (*Id.*).  According to Mayfield, he had participated in more than thirty investigations involving the exploitation of children.  (Tr. 4-5).

According to Mayfield, he was involved in a child pornography investigation of Brooks in 2015.  (Tr. 5).  On July 14, 2015, at approximately 1:30 p.m., Mayfield participated in the execution of a federal search warrant at Brooks's residence, located at 116 Lexington Avenue, Elmira, New York.  (Tr. 5-6).  Mayfield was accompanied by approximately eight other law enforcement officers, including two other FBI employees, four members of the New York

---

[3]  The transcript of the evidentiary hearing shall be referred to as "Tr."  (Docket # 38).

State Police, and two West Elmira police officers who provided perimeter security outside the residence.  (Tr. 37-39).  According to Mayfield, he understood that the perimeter officers would have stopped any individual who attempted to leave the house during the officers' initial entry in order to determine the individual's identity, but would not have arrested any individual who left the premises after the search began.  (Tr. 63-64).

Mayfield was one of the first officers to arrive at the scene, and he observed that Brooks's vehicle was parked in the driveway.  (Tr. 45, 64).  He did not park his vehicle to block the driveway, but did not know whether any of the other law enforcement officers did.  (Tr. 45).

Mayfield approached the door, knocked, and announced the FBI's presence.  (Tr. 65).  After approximately one minute without an answer, Mayfield used a battering ram to enter the premises.  (Tr. 65-66).  Mayfield led the group of officers into the residence with his gun drawn in the "low-ready position" and encountered Brooks near the rear hallway of the house.  (Tr. 39, 48, 69).

Mayfield identified himself and informed Brooks that they were executing a federal search warrant.  (Tr. 40).  Mayfield did not physically restrain Brooks, but stayed with him in the living room while the rest of the search team performed a security sweep of the house.  (Tr. 40-41).  Mayfield could not recall whether Brooks sat on the couch during the course of the sweep.  (Tr. 40).  The security sweep lasted approximately ten minutes.  (*Id.*).

After the sweep, Mayfield and Ken Jensen, another FBI agent, asked Brooks to speak with them in the laundry room.  (Tr. 42).  They walked to the laundry room located at the back of the residence; the agents did not physically direct Brooks to that location.  (Tr. 67; Government's Exhibit ("G. Ex.") 2).  Mayfield testified that they wanted to interview Brooks and chose the laundry room because it was quiet and out of the way and no immediate need

existed to search that area of the home.  (Tr. 7, 9-10, 41; G. Ex. 1).  Jensen moved three chairs from the dining room into the laundry room, and Brooks sat in a chair facing the door, while Mayfield and Jensen sat in chairs facing Brooks that were located between him and the door. (Tr. 11-12, 41-43, 68; G. Exs. 2, 3, 4).  Mayfield testified that the agents' chairs did not directly block the door.  (*Id.*).  According to Mayfield, Brooks was not directed to sit in any particular chair.  (Tr. 43).  The door to the laundry room was closed during the interview.  (Tr. 10, 50).

Mayfield and Jensen were wearing civilian clothing and had their weapons holstered during the interview.  (Tr. 12-13, 16-17, 47).  They introduced themselves to Brooks and told him they were there to execute a federal search warrant and would like to speak with him.  (Tr. 13).  Mayfield informed Brooks that he was not under arrest and would not be arrested that day.  (Tr. 13, 50).  Mayfield also told Brooks that he did not have to speak with the agents or answer their questions and that Brooks was free to leave at any time, although he would not be permitted to return until after the search had been completed.  (Tr. 13, 44, 49).  He was not administered *Miranda* warnings.  (Tr. 62).  Mayfield's contemporaneous notes reflect that he told Brooks that he was not under arrest and did not have to speak to the agents.  (Tr. 15, 56; G. Ex. 7).  According to Mayfield, it was customary practice to restrict an individual's ability to return to the residence during an ongoing search in order to ensure the safety of the search team. (Tr. 13).

During the interview, Brooks was not handcuffed or restrained and was generally cooperative and talkative, although he appeared somewhat nervous and agitated.  (Tr. 17-18, 24-25).  The interview lasted approximately ninety minutes.  (Tr. 18).  Mayfield was present for the entire interview, but Jensen left occasionally to consult with the search team.  (Tr. 21, 55). According to Mayfield, the agents never told Brooks that he had to talk to them, made any

threats or promises to induce him to talk, or raised their voices at him.  (Tr. 16-17, 25-26).

Brooks never asked to stop the interview, leave the room, consult with an attorney, use the

restroom, or have anything to eat or drink.  (Tr. 18-19, 25-27).

At one point during the interview, Brooks got up from his chair while answering

one of the questions and stepped towards Mayfield.  (Tr. 19-20).  The agents did not attempt to

restrain Brooks, and he eventually returned to his seat.  (*Id.*).  More than about an hour into the

interview, Brooks stated that he intended to harm himself after members of law enforcement left

his residence.  (Tr. 22-23, 51).  Brooks's demeanor did not change when he made the statement.

(Tr. 23).  Mayfield responded that self-harm was never a good idea and continued the interview.

(Tr. 23-24).  At some point during the interview, Brooks's mother arrived at the residence,

although Mayfield did not learn of her presence until after the interview had concluded.

(Tr. 45-46).

After the interview, Mayfield and Jensen accompanied Brooks to the living room,

where one of the New York State Police investigators remained with him.  (Tr. 28, 51-52).

According to Mayfield, Brooks was not restrained and was free to move about the house

provided he was escorted by an officer.  (Tr. 29, 48).  Mayfield informed the New York State

Police investigators who were present that Brooks had threatened to harm himself.  (Tr. 27-28,

70).  Mayfield testified that those officers determined to make a mental hygiene arrest.  (Tr. 28,

51, 70).  Approximately one hour after the interview had concluded, Brooks was handcuffed and

transported to a hospital for a mental health evaluation.  (Tr. 29, 52-53).  During the intervening

period, Brooks was not restrained, although Mayfield acknowledged that Brooks would have

been detained had he tried to leave.  (Tr. 54-55).  Mayfield spoke to Brooks's mother before

Brooks was transported to the hospital, but he did not know whether Brooks had conversed with her.  (Tr. 45-46).

Based upon information provided by Brooks during the interview, USB drives were discovered in the sewer near Brooks's residence.  (Tr. 55-56).  Mayfield testified that if Brooks had not informed them that he had flushed the USB drives down the toilet, a search of the sewers would not have been conducted.  (Tr. 56).

### III.   Arrest of Brooks

Mayfield returned to Brooks's residence on August 28, 2015, to execute an arrest warrant for Brooks.  (Tr. 29-30).  Mayfield did not participate in the initial entry and arrest of Brooks, but arrived after he had been handcuffed.  (Tr. 30, 58).  Mayfield briefly removed Brooks's handcuffs so that he could get dressed and offered him an opportunity to use the restroom, which Brooks declined.  (Tr. 30, 59, 75).

Mayfield explained that before placing Brooks in the rear seat of the car, Mayfield put him in a waist-restraint so that Brooks's hands could be handcuffed in front of his body instead of behind his back, which would be more comfortable for the approximately two-hour ride from Elmira to Rochester.  (Tr. 30-32).  Mayfield sat next to Brooks, and Jensen drove the vehicle.  (Tr. 31, 61).  Mayfield had not planned to interview Brooks during the ride.  (Tr. 32).

Immediately after being placed in the vehicle, Brooks repeatedly expressed his desire to speak to the agents.  (Tr. 33).  Mayfield responded by stating that he would have to advise Brooks of his *Miranda* rights because Brooks was in custody.  (Tr. 33, 59).  Mayfield testified that he did not have a *Miranda* notification card with him and verbally informed Brooks of his rights from memory.  (*Id.*).  Mayfield advised Brooks that he had the right to remain silent,

9

that anything he said could be used against him in court, and that he had the right to have an attorney and to have the attorney present during questioning.  (Tr. 34, 60).  He also told Brooks that if he could not afford an attorney one would be appointed for him and that Brooks could stop answering questions at any time.  (*Id.*).  Mayfield asked Brooks whether he understood his rights and whether, with those rights in mind, Brooks wanted to speak to the agents.  (*Id.*).  Brooks responded affirmatively to both questions.  (*Id.*).

Mayfield testified that Brooks was very talkative and spoke with the agents during the entirety of the two-hour trip.  (Tr. 34-35).  Brooks did not appear to be upset and did not ask for a lawyer or for the questioning to cease.  (*Id.*).  He did not complain about needing to use the restroom.  (Tr. 61).  According to Mayfield, Brooks was offered a bottle of water and a banana during the trip.  (Tr. 35).  Mayfield took notes during the interview; the notes do not reflect that he administered *Miranda* warnings to Brooks.  (Tr. 62; G. Ex. 10).

## IV.   **Brooks's Affidavit**

In support of his suppression motion, Brooks submitted an affidavit stating that he had an expectation of privacy in the premises located at 116 Lexington Avenue, Elmira, New York.  (Docket # 31 at 26, ¶ 2).  According to Brooks, he lived at that location with his mother.  (*Id.*).  Brooks stated that on July 14, 2015, six law enforcement agents entered the premises after smashing the door with a battering ram.  (*Id.* at ¶ 3).  One of the agents ordered Brooks to sit on the sofa and did not allow him to move.  (*Id.*).  Brooks stated that the agents had blocked his car in the driveway, preventing him from leaving in the car.  (*Id.* at ¶ 4).  The agents informed Brooks that they had a warrant to search his home, but did not show him a copy of the warrant.

(*Id.*).  According to Brooks, a trooper monitored him while he sat on the couch for approximately twenty minutes.  (*Id.* at ¶¶ 4-5).  Brooks did not believe that he could leave the house.  (*Id.*).

Jensen and Mayfield entered the living room and took Brooks to the laundry room where they had set up three dining room chairs.  (*Id.* at ¶ 5).  Brooks estimated that the room was approximately eight feet by eight feet.  (*Id.*).  The agents closed the laundry room door and "placed" Brooks in one of the chairs and sat in the other chairs that were blocking Brooks's path to the door.  (*Id.*).

Once they were seated, the agents began to question Brooks.  (*Id.* at ¶ 6). According to Brooks, the agents did not advise him of his rights, nor did they tell him that he was not required to speak to them.  (*Id.*).  Brooks stated that during the interview, he stood up and attempted to leave the room, but Jensen raised his arm and ordered Brooks to remain seated. (*Id.*).  Jensen accused Brooks of molesting children, which upset Brooks.  (*Id.*).  At one point, Brooks attempted to stop the interview, but the agents continued to question him.  (*Id.*).  During the entire interview, Brooks was not permitted to use the restroom and was not offered anything to eat or drink.  (*Id.*).

According to Brooks, the interview lasted approximately ninety minutes.  (*Id.* at ¶ 7).  After the interview, the agents released Brooks to the custody of the New York State Police, who handcuffed Brooks and transported him to the hospital for a mental health evaluation.  (*Id.* at 26-27, ¶ 7).  As he was leaving the house, Brooks observed his mother, but the agents told her that she was not allowed to speak to him.  (*Id.* at 27, ¶ 8).

Brooks was arrested on August 28, 2015, put in restraints, and placed in the back of an SUV.  (*Id.* at ¶ 9).  According to Brooks, he also observed his mother in handcuffs.  (*Id.*). During the ride from Elmira to Rochester, which took approximately two hours, Brooks was not

permitted to use the bathroom, although he "urgently" needed to do so.  (*Id.* at ¶ 10).  During the

ride, Mayfield asked if Brooks wanted to speak to the agents, and Brooks did so.  (*Id.*).

According to Brooks, he was never advised of his *Miranda* rights.  (*Id.*).

## REPORT & RECOMMENDATION

### I.    Suppression of July 14, 2015, Statements

First, I address Brooks's motion to suppress the oral statements he made to

Mayfield and Jensen on July 14, 2015.  (Docket ## 31 at 18-20; 40 at 3-6).  Brooks contends that

his statements were obtained in violation of the Fifth Amendment because he was subjected to

custodial interrogation without being advised of or validly waiving his *Miranda* rights.[4]  (*Id.*).

The record makes clear that Brooks was not advised of his *Miranda* rights prior to being

interrogated by Mayfield and Jensen on July 14, 2015; thus, the salient question is whether

Brooks was in custody at the time of the interrogation.  (Docket # 34 at 29-30).

Statements made during custodial interrogation are generally inadmissible unless

a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436

(1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's

statements that are the product of custodial interrogation unless it demonstrates that the

defendant was first warned of his Fifth Amendment privilege against self-incrimination and then

voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  As the Second Circuit has

stated:

> [I]nterrogation consists of express questioning or its functional
> equivalent. . . . [T]he overarching "custody" question is whether a
> reasonable person in the suspect's position would have understood

---

[4]   He also maintains that his statements should be suppressed as fruit of the execution of an unlawful NIT warrant.  As explained below, this Court will conduct a further evidentiary hearing concerning the validity of the NIT warrant and thus reserves on this particular challenge to the admissibility of Brooks's statements.

> [himself] to be subjected to restraints comparable to those
> associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and

brackets omitted).

In determining whether a defendant was in custody, a court must undertake a

two-part analysis.  First, the court must ask "whether a reasonable person would have thought he

was free to leave the police encounter at issue." *United States v. Newton*, 369 F.3d 659, 672 (2d

Cir.), *cert. denied*, 125 S. Ct. 371 (2004).  If the answer is affirmative, the inquiry concludes.  *Id.*

If, however, the reasonable person would not have felt free to leave, the court must then proceed

to the second step of the analysis and determine whether, in addition to feeling not free to leave,

the "reasonable person would have understood his freedom of action to have been curtailed to a

degree associated with formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125

(1983)).  "Only if the answer to this second question is yes was the person 'in custody for

practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'"  *Id.*

(quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United States v. Mitchell*, 966

F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of

actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the

message that the defendant is not free to leave").  Thus, "[a]lthough both elements are required,

the second is the ultimate inquiry because a free-to-leave inquiry reveals only whether the person

questioned was seized[,] . . . a necessary, but not sufficient, condition [of custody]." *United*

*States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (internal quotations omitted).

Considerations relevant to the custody analysis include:

> (1) "the interrogation's duration"; (2) "its location (*e.g.*, at the
> suspect's home, in public, in a police station, or at the border)";
> (3) "whether the suspect volunteered for the interview";

(4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect he was free to leave or under suspicion."

*Id.* (quoting *United States v. FNU LNU*, 653 F.3d at 153).

Brooks and Mayfield have offered conflicting versions of events that occurred on July 14, 2015 – Mayfield through sworn testimony at the hearing and Brooks through a sworn affidavit included in his motion papers. "Although[] the [c]ourt may consider defendant's affidavit, it is a poor substitute for live testimony, which is the subject of cross-examination." *United States v. Nicholson*, 2016 WL 3970927, *3 (W.D.N.Y. 2016); *United States v. Riedman*, 2014 WL 713552, *16 (W.D.N.Y. 2014) (according defendant's affidavit consideration but less weight than conflicting testimony of government witnesses who were subject to cross-examination) (collecting cases). Having carefully evaluated Mayfield's testimony and his demeanor as a witness, I find Mayfield's testimony credible concerning the execution of the search warrant and the circumstances of the interview.[5]

Specifically, I find that when the search team entered the residence, which they did with the use of a battering ram, Mayfield encountered Brooks coming from the rear of the house. Mayfield had his weapon drawn but not pointed at Brooks at that time. Brooks remained in the living room in the presence of law enforcement officers while a protective sweep was undertaken. I find that Jensen and Mayfield asked, and did not order, Brooks to speak with them in the laundry room and that Brooks complied. In the laundry room, Brooks was not ordered to sit in any particular chair; although the chairs that the agents sat in were positioned between

---

[5]   In reaching this conclusion, the Court draws no adverse inference against Brooks based upon his decision not to testify. *United States v. Hill*, 2009 WL 922475, *4 (W.D.N.Y.) ("[a]lthough defendant . . . had submitted an affidavit in support of his motion to suppress, he chose not to take the stand at the suppression hearing[;] . . . [w]ithout drawing any adverse inference from his failure to testify, I simply indicate that, by not testifying, defendant has failed to contradict the government's evidence with his own testimony") (internal quotations and citations omitted), *report and recommendation adopted*, 2009 WL 928322 (W.D.N.Y. 2009).

Brooks and the laundry room door, the door was not blocked by the chairs or the agents.

Significantly, Brooks was told that he did not have to speak to the agents and that he was not

under arrest and was free to leave, although he would not be permitted to return to the residence

until the search was completed.  I also find that Brooks never tried to end the interview or leave

the laundry room.  Brooks did not ask to use the restroom or request any food or drink during the

interview.  He was not handcuffed or physically restrained during the interview.  I further find

that Brooks was not handcuffed until approximately one hour after the interview concluded,

when New York State Police investigators did so to effect a mental hygiene arrest.

Several of these facts support Brooks's argument that a reasonable person in his

situation might have believed that he was not free to leave.  First, close to ten law enforcement

officers arrived at Brooks's residence, seven of whom entered his home by breaking through the

front door with a battering ram.  Mayfield, the first officer to enter, had his weapon drawn when

he entered and saw Brooks.  The room that Mayfield and Jensen selected for the interview was

small, and they sat between Brooks and the closed door to the room, although they did not

directly block the door.

Mayfield testified that Brooks's freedom to move about in his residence was

restricted.  Specifically, he explained that Brooks would not have been permitted to walk around

his residence without an escort during the search, although the record does not reveal whether

Brooks was informed of that fact.  At the conclusion of the search, Brooks was handcuffed, taken

into custody, and transported to the hospital for a mental health evaluation.

With respect to the agents' use of weapons, it is significant that although Mayfield

entered the residence with his gun drawn, he did not point it at Brooks but held it in a "low-ready

position."  Further, he holstered his gun after the initial entry, and it was not visible during the

interview.  *See United States v. Simmonds*, 641 F. App'x 99, 102 (2d Cir. 2016) ("[a]lthough the use of firearms is generally an important factor in our analysis of the totality of the circumstances, the fact that the officers initially used firearms . . . does not compel a conclusion that the ensuing interrogation was custodial, especially where the use of firearms was 'necessitated by the officers' safety concerns' and ended 'as soon as … the perceived security threat abated'") (quoting *United States v. Cota*, 953 F.2d 753, 759 (2d Cir. 1992)); *United States v. Gaynor*, 2007 WL 1875651, *3 (D. Conn. 2007) ("[a]lthough [defendant] was initially confronted by several law enforcement agents, at least one of whom had a weapon drawn and made physical contact with [defendant], that was not enough to constitute a custodial situation when considered with other circumstances").  Additionally, although Mayfield and Jensen chose the laundry room for the interview, Brooks consented to accompany the agents to the room, and no credible evidence suggests that he was ordered or physically escorted to the room.  *See United States v. Sergi*, 2013 WL 1285865, *7 (D. Vt. 2013) ("[a]lthough [d]efendant entered the bedroom at [the agent's] request, there is no evidence that [the agent] ordered him to join her, and she did not physically touch him, threaten him, or make a display of force while escorting him to the room").

Of course, the interview occurred in a room in Brooks's own residence.  "The home is 'the most constitutionally protected place on earth'; thus, the right to terminate the interrogation and be 'free to leave' is 'hollow' if the one place that the individual cannot retreat to, or exclude law enforcement from, is [his] home."  *United States v. Faux*, 828 F.3d at 135 (quoting *United States v. Craighead*, 539 F.3d 1073, 1082-83 (9th Cir. 2008)).  That said, "courts rarely conclude, absent a formal arrest, that a suspect questioned in [his] own home is 'in custody.'"  *Id.* at 135-36.

In this case, although Brooks was isolated in a small room towards the back of the house while five other law enforcement officers searched his residence, he was interviewed in a conversational tone by two plain-clothed agents and was not restrained, physically touched, or threatened.  The credible testimony demonstrates that although Brooks's freedom of movement inside the house was restricted – a fact that he may not, in fact, have known – he was free to leave the premises – a fact that was expressly communicated to him by the agents.  *See United States v. Schaffer*, 2014 WL 1515799, *9 (E.D.N.Y. 2014) ("[w]hile . . . [defendant's] freedom to leave was curtailed in some degree, courts in this circuit have previously found that a defendant was not in custody under similar circumstances where the freedom of movement was limited in some degree") (collecting cases).  That the New York State Police investigators later determined to effect a mental health arrest after learning that Brooks had threatened self-harm does not mean that he was in custody at the time of the interview.  *See United States v. Patt*, 2008 WL 2915433, *16 (W.D.N.Y. 2008) ("[t]he fact that the agents ultimately arrested [defendant] after reviewing the videotape and conferring with prosecutors – something that they had not originally planned to do – does not itself transform their pre-arrest encounter with [defendant] into a custodial one").

Brooks willingly accompanied the agents to the laundry room, and he was explicitly and clearly informed that he did not have to speak to them and that he was not under arrest and was free to leave.  Even if his car had been blocked (a fact that is not clear from the record), Brooks could have exited the house on foot.  The search occurred at about 1:30 p.m. on a July afternoon.  Neither the hour of the day nor the temperature likely would have deterred his departure.  The interview lasted approximately ninety minutes, and Brooks never asked to

17

suspend it, to leave the room, to be provided an attorney, to use the restroom, or to be provided with food or drink.

On the record before me, I find that a reasonable person in Brooks's position would have understood that he was free to leave.  *See Faux*, 828 F.3d at 139 (defendant was not in custody when she was separated from her husband and interviewed for two hours in her dining room after approximately twelve agents from three different agencies entered her house to execute warrant, her movements were monitored but she was not restrained, the agents did not display their weapons, she was told during the interview that she was not under arrest, and the tone of the questioning was conversational); *United States v. Simmonds*, 641 F. App'x at 103 (defendant was not in custody when he was interviewed in living room after officers confronted him with their guns drawn and escorted him at gunpoint to living room; "[i]n contrast to cases finding custody because of a 'police-dominated atmosphere,' [the interviewing agent] was dressed in plain clothes, his weapon was holstered and concealed by his jacket, he was not positioned between [defendant] and the apartment's exit, no other officers were involved in the interview and the tone of the interview was conversational"); *United States v. Vado*, 87 F. Supp. 3d 472, 480 (S.D.N.Y. 2015) (defendant was not in custody when he was interviewed in his home while several officers executed a search warrant; "[defendant] was interviewed at home, was not restrained, was explicitly told that he was free to leave, and was interviewed for only a modest length of time – the [c]ourt finds that [defendant] was not in custody"); *United States v. Chamberlin*, 2010 WL 1904500, *9 (W.D.N.Y.) (reasonable person in defendant's position would not have believed himself to be in custody when defendant "was questioned in his home; he was not handcuffed or otherwise restrained; the agents were not positioned between him and the front door; the agents never physically or verbally threatened him; and [defendant]

was not intoxicated or confused"), *report and recommendation adopted*, 2010 WL 2287562

(W.D.N.Y. 2010).

Even if it could be said that a reasonable person in Brooks's position would not

have felt free to leave the encounter, the record does not support a finding that "a reasonable

person [in Brooks's position] would have understood his freedom of action to have been

curtailed to a degree associated with formal arrest[,]" – a finding that is necessary to any

conclusion that Brooks was in custody at the time of the interview.  *United States v. Newton*, 369

F.3d at 672; *United States v. Sergi*, 2013 WL 1285865 at *6 ("[w]hile [d]efendant presents an

exceedingly close question as to whether a reasonable person in his position would feel free to

leave or terminate the interrogation, there is far less evidence that [d]efendant's freedom of

movement was restrained to a degree commensurate with a formal arrest").  Indeed, as the

government notes (Docket # 41 at 7), Brooks's statement to the agents concerning his thoughts

about harming himself after the agents left his premises belies any suggestion that he

subjectively believed he was in custody or that he would be arrested at the conclusion of the

interview.  On this record, I find that at the time Brooks made the challenged statements, he was

not subjected to custodial interrogation and *Miranda* warnings were not required.

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), upon which Brooks

relies, is factually distinguishable.  In that case, eight members of three different law

enforcement agencies entered the defendant's home, some with their guns drawn.  *Id.* at 1078.

The defendant testified that he doubted whether the agent who interviewed him had the authority

to speak for each of the agencies represented.  *Id.* at 1088.  Significantly, the defendant was

interviewed in a storage room by an agent wearing a "raid vest," and the only exit to the room

was blocked by a similarly-attired and visibly-armed detective who stood "leaning against the

wall near the exit, with his back to the door" and did not participate in the interview. *Id.* at 1078, 1086. Judged under controlling Second Circuit authority, I find that the circumstances of Brooks's encounter compel the conclusion that he was not in custody during the interview. *See Faux*, 828 F.3d at 139; *Simmonds*, 641 F. App'x at 103. Accordingly, I recommend denial of Brooks's motion to suppress his July 14, 2015, statements on the grounds that he was subjected to custodial interrogation.[6]

Brooks also seeks to suppress a USB drive found in his bedroom and two USB drives discovered in the sewer as the tainted fruit of the statements he made on July 14, 2015. (Docket # 40 at 6-8). I recommend that the district court deny Brooks's motion to suppress the USB drives as fruit of the poisonous tree.

## II.   <u>Suppression of August 28, 2015, Statements</u>

Brooks also seeks to suppress the oral statements he made to Mayfield and Jensen on August 28, 2015, during the car ride from Elmira to Rochester. (Docket ## 31 at 18-20; 40 at 8-9). Brooks contends that his statements were obtained in violation of the Fifth Amendment because he was subjected to custodial interrogation without being advised of or validly waiving his *Miranda* rights. (*Id.*). He also maintains that the circumstances of his interrogation rendered his statements involuntary. (*Id.*). The government opposes the motion on the grounds that Brooks was provided *Miranda* warnings prior to being interrogated and maintains that his statements were otherwise voluntary.[7] (Docket # 41 at 8-15).

---

[6] Insofar as Brooks's motion papers may be read to include an argument that his statements were otherwise involuntary, I disagree. The circumstances of the encounter do not demonstrate that his will was overborne by the agents' conduct so as to induce involuntary statements.

[7] In making this argument, the government maintains that the Court should disregard Brooks's affidavit because he did not testify and was not subject to cross-examination. (Docket # 41 at 13-15). As stated above, I have

As with the July 14, 2015, statements, Mayfield's testimony concerning the circumstances of the August 28, 2015, interview of Brooks differs from several factual allegations contained in Brooks's affidavit.  Based upon my evaluation of Mayfield's demeanor and his testimony, I credit Mayfield's testimony and conclude that Brooks was provided *Miranda* warnings prior to being interrogated by Mayfield and Jensen.  I also find that Mayfield provided Brooks the opportunity to use the restroom prior to placing him in the SUV, that Brooks declined to use the restroom at that time, and that Brooks did not request to use the restroom during the trip from Elmira to Rochester.

On the record before me, I find that Brooks was properly advised of his *Miranda* rights and voluntarily waived them before speaking to the agents.  Specifically, Mayfield testified that he verbally recited to Brooks each of the *Miranda* rights.  Mayfield then asked him whether he understood his rights and whether, with those rights in mind, he wanted to speak to the agents.  Brooks responded affirmatively to both questions.  No *Miranda* violation occurred, and suppression of Brooks's statements thus is not warranted on that basis.

In addition to establishing a valid waiver, the government must also establish that the defendant's statements were made voluntarily within the meaning of the Due Process Clause. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000) (recognizing "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment").  In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about

---

considered Brooks's affidavit, but in doing so have also considered that he did not testify and was not subjected to cross-examination.

[statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.)

(quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert.*

*denied*, 510 U.S. 1003 (1993).  In evaluating the totality of the circumstances, the court must

assess:  "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the

conduct of law enforcement officials."  *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010)

(quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)),

*cert. denied*, 131 S. Ct. 969 (2011).  Where circumstances suggest evidence of "brutality,

[p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed

involuntary.  *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting

*United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)),

*cert. denied*, 133 S. Ct. 48 (2012).

   The credible testimony establishes that Brooks's statements were not coerced.

Mayfield testified that Brooks himself initiated the communications and was talkative and

cooperative throughout.  The agents did not make any threats or promises or use any physical

force to induce Brooks to talk.  According to Mayfield, Brooks never asked for the questioning

to cease or for an attorney, and did not make any requests that were denied.  Although Brooks

was in restraints for the entirety of the two hour interview, the use of restraints was not designed

to compel Brooks to talk but was employed to ensure the safety of the transporting officers.

Considering the totality of the circumstances, I find that Brooks's statements were voluntary and

recommend that the district court deny his motion to suppress on this basis.

**III.**     <u>**Validity of the NIT Warrant**</u>

Next, I address Brooks's challenge to the NIT warrant.  (Docket # 31).  Brooks maintains that the NIT warrant was overbroad, was not supported by probable cause, and did not authorize a search of his computer.  (*Id.* at 8-14).  He also maintains that the NIT warrant was invalid because it was issued in violation of Rule 41 of the Federal Rules of Criminal Procedure.  (*Id.* at 14-15).

The government opposes the motion, maintaining that the deployment of the NIT did not constitute a search within the meaning of the Fourth Amendment.  (Docket # 34 at 8-12).  In any event, the government argues, the NIT warrant was supported by probable cause, was not overly broad, and complied with Rule 41.  (*Id.* at 13-23).  Further, the government argues that even if the NIT warrant had been issued in violation of Rule 41, suppression is not warranted because the violation was technical in nature and Brooks did not suffer any prejudice.  (*Id.* at 23-26).  Finally, the government maintains that suppression is not warranted because the agents relied upon the NIT warrant in objective good faith and public policy weighs against suppression.  (*Id.* at 26-29).

Having carefully reviewed the record and relevant caselaw and after further consideration,[8] I conclude that additional briefing and an evidentiary hearing concerning whether deployment of the NIT constituted a search within the meaning of the Fourth Amendment would be helpful to the Court.  Accordingly, the parties are directed to file supplemental submissions addressing whether deployment of the NIT constituted a trespass within the meaning of the Fourth Amendment.  *United States v. Jones*, 132 S. Ct. 945, 951 (2012); *see also Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013) ("[t]he *Katz* reasonable-expectations test has been *added*

---

[8]  As noted by the parties in their original submissions, various courts have issued decisions regarding the validity of the NIT warrant at issue in this case, and the Court is familiar with those cases.

to, not *substituted* for, the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas") (internal quotations omitted).  Of particular interest to the Court is whether the virtual intrusion of Brooks's computer by the NIT is tantamount to a physical intrusion of a constitutionally protected area within the meaning of the Fourth Amendment.  *See*, *e.g.*, *United States v. Jones*, 132 S. Ct. at 953 ("[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to the [reasonable-expectation-of-privacy] analysis") (emphasis omitted); *United States v. Carter*, 2015 WL 5474180, *2 (N.D. Ohio 2015) ("[the sergeant's] retrieval of files [from defendant's computer] does not constitute a physical trespass into a constitutionally protected area"); *United States v. Brashear*, 2013 WL 6065326, *3 (M.D. Pa. 2013) ("[t]he investigation of a file sharing program does not involve any physical trespass onto a constitutionally protected area[;] . . . [the] investigation involves 'the transmission of electronic signals without trespass' and does not implicate [defendant's] Fourth Amendment rights under *Jones*"); *United States v. Martinez*, 2013 WL 12124429, *4 (E.D. Wash. 2013) (assuming without deciding that electronic transmissions can amount to a trespass), *aff'd*, 588 F. App'x 741 (9th Cir. 2014); *United States v. Alabi*, 943 F. Supp. 2d 1201, 1265-66 (D.N.M. 2013) (suggesting that "the trespass analysis applies when the government *does* engage in a physical intrusion, [but] when the government *does not* engage in a physical intrusion, but rather engages in a virtual intrusion, the . . . reasonable-expectation-of-privacy analysis applies to the alleged virtual intrusion") (internal quotations omitted), *aff'd*, 597 F. App'x 991 (10th Cir. 2015); *United States v. Brooks*, 2012 WL 6562947, *5 (E.D.N.Y. 2012) (no physical trespass where "[t]he agent did not install any device or software on

[defendant's] computer to enable monitoring or tracking, did not physically enter [defendant's] home, and did not physically access his computer").

Brooks is directed to file his memorandum by no later than **January 6, 2017**; the government is directed to file its memorandum by no later than **January 13, 2017**.  Upon review of the submissions, the Court will determine whether further oral argument would be beneficial.

An evidentiary hearing shall be conducted on **January 25, 2017**, at **1:30 p.m.**, in order to develop the record sufficiently to permit the court to determine whether Brooks had a reasonable expectation of privacy in the information obtained through the execution of the NIT warrant.  The government should be prepared to present evidence concerning Brooks's expectation of privacy, including but not limited to evidence relating to the following questions and issues:

1.      Similar to the IP address, is the other data that was obtained through use of the NIT the type of data that is typically conveyed by computer users to third parties or accessible by the public?

2.      In general, how does the NIT operate to gather the data conveyed to the government and does it permit the government to access any other data on the activating computer?

3.      Is all of the data conveyed by the NIT to the government data that is gathered by the NIT from the activating computer or is some of the data generated by operation of the NIT?

4.      When a user accesses other websites, do the websites typically download content onto a user's computer and, if so, what type of content?

5.      Does the Playpen website notify users that content will be downloaded onto their computers when they access the site?

**<u>CONCLUSION</u>**

For the reasons stated above, I recommend that Brooks's motion to suppress statements on the grounds that his *Miranda* rights were violated or that his statements were not voluntary (**Docket ## 31, 40**), be **DENIED**.  The parties are directed to file supplemental memoranda as directed above, and a further evidentiary hearing concerning the validity of the NIT warrant will be held on **January 25, 2017**, at **1:30 p.m.**

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      December 22, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**</u>

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      December 22, 2016

---

[9]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).